UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

**CHARTIS PROPERTY CASUALTY
COMPANY**
175 Water Street
18th Floor
New York, NY 10038
*Principal Place of Business in New York
County, New York*

       Plaintiff

v.

**GEORGE W. HUGUELY V**
Inmate No. 1458946
Keen Mountain Correctional Center
State Route 629
P.O. Box 860
Oakwood, VA 24631
*Resident of Montgomery County, Maryland
currently incarcerated in Buchanan County,
Virginia*

       Defendant

and

**ANDREW MURPHY III**
3230 Park View Road
Chevy Chase, MD 20815
*Resident of Montgomery County, Maryland and
Contra Costa County, California*

**MARTA MURPHY**
3230 Park View Road
Chevy Chase, MD 20815
*Resident of Montgomery County, Maryland*

**Civil Action No. 13-cv-1479**

**SHARON D. LOVE, ADMINISTRATOR OF THE ESTATE OF YEARDLEY R. LOVE, DECEASED**
1507 Ivy Hill Road
Cockeysville, MD 21030
*Resident of Baltimore County, Maryland*

       Interested Parties

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW, Plaintiff, Chartis Property Casualty Company ("Chartis"), by and through undersigned counsel, who files this Complaint for Declaratory Judgment against Defendant, George W. Huguely V ("Huguely") and names Andrew Murphy III ("Andrew Murphy"), Marta Murphy, and Sharon D. Love, Administrator of the Estate of Yeardley R. Love, Deceased, as Interested Parties. For cause, Chartis states as follows:

## THE PARTIES AND JURISDICTION

1.      Chartis is an insurance company incorporated in the State of Pennsylvania, which has its principal place of business in New York County, New York.

2.      Huguely is a legal adult currently incarcerated at the Keen Mountain Correctional Center in Buchanan County, Virginia. Prior to his incarceration in the Virginia state penitentiary system, Huguely was domiciled in Montgomery County, Maryland.

3.      Huguely is the natural born son of Marta Murphy and George W. Huguely IV ("Huguely's Father").

4.      Marta Murphy and Huguely's Father maintain separate residences.

5.      Andrew Murphy is a legal adult residing in Montgomery County, Maryland and Contra Costa County, California.

6.      Marta Murphy is a legal adult residing in Montgomery County, Maryland.

7.      Sharon D. Love is a legal adult residing in Baltimore County, Maryland.  Sharon D. Love is the Administrator of the Estate of Yeardley R. Love, who is deceased.

8.      Jurisdiction is proper under 28 U.S.C. §§ 1332 and 2201.  This matter involves a dispute among citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

9.      This Court has personal jurisdiction over all parties to this matter inasmuch as the defendant and the interested parties are domiciled in the State of Maryland.  Additionally, this matter arises out of a contract to provide services, *i.e.* insurance coverage, in the State of Maryland.

10.      Venue is proper under 28 U.S.C. § 1391(a) because the defendant and the interested parties are domiciled in the State of Maryland, and the subject insurance polices referenced in this Complaint were intended to provide insurance coverage in connection with real property in the State of Maryland.

11.      An actual controversy exists between Chartis and Huguely as the parties have antagonistic claims regarding the obligation of Chartis to provide insurance coverage to Huguely under two Chartis insurance policies in connection with the civil lawsuit styled *Sharon D. Love, Administrator of the Estate of Yeardley R. Love, Deceased v. George W. Huguely, V*, Case No. 2012-130 pending in the Circuit Court for the City of Charlottesville, Virginia (the "Civil Litigation").

12.     Andrew and Marta Murphy have an interest in the outcome of this declaratory judgment action as it relates to Chartis' insurance coverage because they are the named insureds in both insurance policies at issue in this case.

13.     Sharon D. Love has an interest in the outcome of this declaratory judgment action as it relates to Chartis' obligation to provide insurance coverage for claims alleged by her, as the Administrator for the Estate of Yeardley R. Love, against Huguely in the Civil Litigation.  The lawsuit filed by Sharon D. Love against Huguely is the subject of this insurance coverage dispute.  A copy of the original Complaint that initiated the Civil Lawsuit is attached hereto as **Exhibit 1**.  A copy of the Amended Complaint filed in the Civil Litigation is attached hereto as **Exhibit 2**.

## FACTUAL BACKGROUND

14.     It is alleged in the Civil Litigation that, on or about May 2-3, 2010, Huguely entered Yeardley R. Love's bedroom in her apartment in Charlottesville, Virginia by kicking a hole in her bedroom door.  *See* **Exhibit 2** at ¶¶ 5, 8.

15.     It is alleged that, while in Yeardley R. Love's bedroom, Huguely engaged in a physical altercation with Yeardley R. Love by grabbing her, holding her arms and shoulders, shaking her, wrestling with her on the floor, tossing her onto her bed, and engaging in other acts of physical force to her including grabbing, choking, hitting, and/or punching her.  *See* **Exhibit 2** at ¶¶ 10-11, 17-18, 23-24, 31-32, 43, 48.

16.     It is alleged that the physical altercation resulted in bodily injuries to Yeardley R. Love, including a bloody nose, severe physical injuries, and her ultimate death.  *See* **Exhibit 2** at ¶¶ 10, 13, 17, 20, 23, 24, 28, 31, 32, 37, 45.

17.     At the time of the alleged altercation, Huguely and Yeardley R. Love were both students at the University of Virginia.  *See* **Exhibit 2** at ¶ 4.  At the time of the alleged altercation, Huguely and Yeardley R. Love rented apartments in Charlottesville, Virginia.

18.     On or about February 22, 2012, a jury found Huguely guilty of second degree murder of Yeardley R. Love in the criminal case styled *Commonwealth of Virginia v. George W. Huguely V*, Criminal Case No. 2011-102 in the Circuit Court for the City of Charlottesville, Virginia.

19.     To recover damages suffered in connection with Yeardley R. Love's injuries and death, Sharon D. Love originally sued Huguely for "Negligence – Failure to Use Ordinary Care" (Count One); "Negligence – Indifference and Acting With Utter Disregard of Caution" (Count Two); "Negligence – Acting With Conscious Disregard and Reckless Indifference" (Count Three); "Willful and Malicious Injury and Death to Love" (Count Four); "Assault and/or Battery" (Count Five); and "Punitive Damages" (Count Six).  *See* **Exhibit 1**.

20.     Sharon D. Love, however, recently amended her complaint to remove Count Four for "Willful and Malicious Injury and Death to Love," and restated her he claims as follows: "Negligence – Failure to Use Ordinary Care" (Count One); "Gross Negligence – Indifference and Acting With Utter Disregard of Caution" (Count Two); "Willful and Wanton Negligence – Acting With Conscious Disregard and Reckless Indifference" (Count Three); "Assault and/or Battery" (Count Four); and "Punitive Damages" (Count Five).  *See* **Exhibit 2**.

21.     In her Amended Complaint, Sharon D. Love seeks $29,450,000 in compensatory damages, plus interest from May 2-3, 2010, plus $1,000,000 in punitive damages from Huguely. *See* **Exhibit 2**.  Additionally, in connection with Counts Three and Four, Sharon D. Love seeks a

finding that Huguely willfully and maliciously caused injuries and/or death to Yeardley R. Love pursuant to 11 U.S.C. § 523(a)(6).  *See* **Exhibit 2** at pp. 10-11.

22.     In connection with the claims made against him by Sharon D. Love in the Civil Litigation, Huguely sought insurance coverage from Chartis pursuant to a Chartis Homeowners Insurance Policy and a Chartis Personal Excess Liability Insurance Policy issued to Andrew and Marta Murphy.

23.     Chartis is currently providing a defense to Huguely in connection with the Civil Litigation pursuant to a complete reservation of rights.

<u>**FACTUAL BACKGROUND – THE HOMEOWNERS POLICY**</u>

24.     In 2010, Andrew and Marta Murphy purchased a Homeowners Insurance Policy, Policy Number PCG 0005228359 (hereinafter referred to as "the Homeowners Policy") from Chartis.  That policy became effective on January 25, 2010 and remained in effect until January 25, 2011.  A copy of the Homeowners Policy is attached to this Complaint as **Exhibit 3**.

25.     Andrew and Marta Murphy are named as the Insureds in the Declarations Page of the Homeowners Policy.  *See* **Exhibit 3** at Form PCHO-MDDEC (07/01).

26.     The Insuring Agreement in "Part III – Liability" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy states:

> We will pay **damages** an **insured person** is legally obligated to pay for the **personal injury** or **property damage** caused by an **occurrence** covered by this policy anywhere in the world, unless stated otherwise or an exclusion applies.

*See* **Exhibit 3** at Form PCHO (09/06), p. 9 (emphasis in the original).

27.     "Part III – Liability" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy also states: "[w]e will pay the costs to defend an **insured person** against

any suit seeking covered **damages** for **personal injury** or **property damage**, even if the suit is false, fraudulent or groundless." *See* **Exhibit 3** at Form PCHO (09/06), p. 9 (emphasis in the original).

28.     That portion of the Homeowners Policy also states: "[w]e may investigate and settle any claim or suit at our discretion." *See* **Exhibit 3** at Form PCHO (09/06), p. 9.

29.     The term "insured person" is defined in "Part I – Definitions" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy, which states in pertinent part: "**Insured Person** means: **a.** You or a **family member**…." *See* **Exhibit 3** at Form PCHO (09/06), p. 1 (emphasis in the original).

30.     The term "You" is defined in "Part I – Definitions" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy, which states in pertinent part: "In this policy, the words 'you', 'your' and 'yours' refer to the person or persons named on the Declarations Page and his or her 'spouse' who lives in the same household." *See* **Exhibit 3** at Form PCHO (09/06), p. 1. Therefore, the terms "you," "your" and "yours' in the Homeowners Policy refer to Andrew and Marta Murphy.

31.     The term "family member" is defined in "Part I – Definitions" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy, which states: "**Family Member** means a person related to you by blood, marriage or adoption that lives in your household including a ward or foster child." *See* **Exhibit 3** at Form PCHO (09/06), p. 1 (emphasis in the original).

32.     The term "personal injury" is defined in "Part I – Definitions" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy, which states in

pertinent part: "**Personal Injury** means the following injuries, or resulting death: **a. Bodily injury**;…or **h.** Assault and battery when committed with the intent of protecting persons." *See* **Exhibit 3** at Form PCHO (09/06), p. 2 (emphasis in the original).

33.     The term "bodily injury" is defined in "Part I – Definitions" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy, which states: "**Bodily Injury** means bodily harm, including resulting sickness or disease, required care, loss of services or death." *See* **Exhibit 3** at Form PCHO (09/06), p. 1 (emphasis in the original).

34.     The term "occurrence" is defined in "Part I – Definitions" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy, which states:

> **Occurrence** means:
>
> **a.**  A loss or an accident, to which this insurance applies, including continuous or repeated exposure to substantially the same general harmful conditions, which occurs during the Policy Period and results in **personal injury** or **property damage**; or
>
> **b.**  An offense, to which this insurance applies, including a series of related offenses, committed during the Policy Period that results in **personal injury** or **property damage**.

**Exhibit 3** at Form PCHO (09/06), p. 1 (emphasis in the original).

35.     "Part III – Liability" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy also contains an exclusion that states in pertinent part:

> This policy does not provide coverage for liability, defense costs or any other cost or expense for:
>
> *         *         *
>
> **17.** Intentional Acts
>
> **Personal Injury** or **property damage** resulting from any criminal, willful, intentional or malicious act or omission by any person.

We also will not cover claims for acts or omissions of any person which are intended to result in, or would be expected by a reasonable person to cause, **property damage** or **personal injury**. This exclusion applies even if the injury or damage is of a different kind or degree, or is sustained by a different person, than expected or intended. This exclusion does not apply to **bodily injury** if the **insured person** acted with reasonable force to protect any person or property.

*See* **Exhibit 3** at Form PCHO (09/06), pp. 9, 11 (emphasis in the original).

36.     "Part V – Conditions" of the "Homeowners Coverage – Policy Provisions" Form of the Homeowners Policy sets forth an insured person's obligations under the Homeowners Policy. That portion of the Homeowners Policy states in pertinent part:

> **B.** Your Duties After a Loss
>
> In the event of an **occurrence** which is likely to involve this policy, or if you or any other **insured person** under this policy is sued in connection with an **occurrence** which may be covered under this policy, you or an insured person must:
>
> *          *          *
>
> **6.** As often as we reasonably require:
>
> *          *          *
>
> **c.** Submit to separate examination under oath.
>
> *          *          *
>
> **10.** Assist and cooperate with us in the conduct of the defense by helping us:
>
> *          *          *
>
> **d.** To secure and give evidence and obtain the attendance of witnesses.

**Exhibit 3** at Form PCHO (09/06), p. 12 (emphasis in the original).

## FACTUAL BACKGROUND – THE EXCESS POLICY

37.     In 2010, Andrew and Marta Murphy also purchased a Personal Excess Liability Insurance Policy, Policy Number PCG 0004481436 (hereinafter referred to as the "Excess Policy") from Chartis.  That policy became effective on January 25, 2010 and remained in effect until January 25, 2011.  A copy of the Excess Policy is attached to this Complaint as **Exhibit 4**.

38.     Andrew and Marta Murphy are named as the Insureds in the Declarations Page of the Excess Policy.  *See* **Exhibit 4** at Form PEL-DEC (03/06).

39.     The Insuring Agreement in "Part II – What Is Covered" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy states:

> We will pay **damages** an **insured person** is legally obligated to pay because of **personal injury** or **property damage** caused by an **occurrence**, covered by this policy anywhere in the world:
>
> **a.**  In excess of **damages** covered by the required underlying insurance or the Minimum Required Underlying Limit, whichever is greater; or
>
> **b.**  From the first dollar of **damages** where required underlying insurance either:
>
> **1)**  Exists but, coverage does not apply for a particular **occurrence**; or
>
> **2)**  Is not required under this policy and no underlying insurance exists.

*See* **Exhibit 4** at Form PEL (03/06), p. 4 (emphasis in the original).

40.      "Part IV – Defense Coverage and Claim Expense" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy also states in pertinent part:

> We will defend an **insured person** against any suit seeking **damages** covered by Excess Liability…where:

1) The underlying insurance has been exhausted by payment of claims;

2) No underlying insurance applies; or

3) With respect to Limited Charitable Board Directors and Trustee Liability, any applicable Deductible has been exhausted.

even if the allegations of the suit are groundless, false, or fraudulent.

*See* **Exhibit 4** at Form PEL (03/06), p. 7 (emphasis in the original).

41.     That portion of the Excess Policy also states: "[w]e may investigate and settle any claim or suit at our discretion."  *See* **Exhibit 4** at Form PEL (03/06), p. 7.

42.     The term "insured person" is defined in "Part I – Definitions" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy, which states in pertinent part: "**Insured Person** means: **a.** You or a family member…."  *See* **Exhibit 4** at Form PEL (03/06), p. 2 (emphasis in the original).

43.     The term "You" is defined in "Part I – Definitions" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy, which states in pertinent part: "In this policy, the words 'you', 'your' and 'yours' mean the person or persons named on the Declarations Page and his or her spouse who lives in the same household."  *See* **Exhibit 4** at Form PEL (03/06), p. 1.  Therefore, the terms "you," "your" and "yours' in the Excess Policy refer to Andrew and Marta Murphy.

44.     The term "family member" is defined in "Part I – Definitions" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy, which states: "**Family Member** means a person related to you by blood, marriage or adoption that lives in

your household, including a ward or foster child." *See* **Exhibit 4** at Form PEL (03/06), p. 1 (emphasis in the original).

45.     The term "personal injury" is defined in "Part I – Definitions" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy, which states in pertinent part: "**Personal Injury** means the following injuries, or resulting death: **a. Bodily injury**;… or **h.** Assault and battery when committed with the intent of protecting persons." *See* **Exhibit 4** at Form PEL (03/06), p. 2 (emphasis in the original).

46.     The term "bodily injury" is defined in "Part I – Definitions" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy, which states: "**Bodily Injury** means physical bodily harm, including sickness or disease that results from it, and required care, loss of services or resulting death." *See* **Exhibit 4** at Form PEL (03/06), p. 1 (emphasis in the original).

47.     The term "occurrence" is defined in "Part I – Definitions" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy, which states:

> **Occurrence** means:
>
> **a.** An accident, including continuous or repeated exposure to substantially the same general harmful conditions, which first results during the Policy Period in **bodily injury** or **property damage**; or
>
> **b.** An offense, including a series of related offenses, committed during the Policy Period that results in **personal injury**.

**Exhibit 4** at Form PEL (03/06), p. 2 (emphasis in the original).

48.     "Part V – What Is Not Covered – Exclusions" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy contains an exclusion that states in pertinent part:

> This insurance does not provide coverage for liability, defense costs or any other cost or expense:
>
>         *        *        *
>
> **8.**  Intentional Act
>
> Arising out of any criminal, willful, fraudulent, dishonest, intentional or malicious act or omission by any person, or the gaining of any profit or advantage to which an **insured person** is not entitled.  We will not cover any amount for which the **insured person** is not financially liable or which are without legal recourse to the **insured person**.  We also will not cover claims for acts or omissions of any person which are intended to result in, or would be expected by a reasonable person to cause, **property damage** or **personal injury**.
>
> This exclusion applies even if the injury or damage is of a different kind or degree, or is sustained by a different person, than expected or intended.  This exclusion does not apply to **bodily injury** if the **insured person** acted with reasonable force to protect any person or property.

*See* **Exhibit 4** at Form PEL (03/06), p. 9 (emphasis in the original).

49.     "Part VI – Your Duties" of the "Personal Excess Liability Coverage – Policy Provisions" Form of the Excess Policy sets forth an insured person's obligations under the Excess Policy.  That portion of the Excess Policy states in pertinent part:

> **C.  Your Duties After a Loss**
>
> In the event of an **occurrence**, **wrongful employment act**, or **wrongful act** which is likely to involve this policy, or if you or any other **insured person** under this policy are sued or a claim **or director and trustee claim** is made against you in

connection with an **occurrence**, **wrongful employment act** or **wrongful act** which may be covered under this policy:

\* \* \*

    **2.** An **insured person** must:

\* \* \*

        **b.** Assist and cooperate with us in the conduct of the defense by helping us:

\* \* \*

            **4)** To secure and give evidence and obtain the attendance of witnesses.

**Exhibit 4** at Form PEL (03/06), p. 14 (emphasis in the original).

## FACTUAL BACKGROUND – CHARTIS' COVERAGE INVESTIGATION AND HUGUELY'S REFUSAL TO COOPERATE

50.    On May 22, 2012, Chartis, through undersigned counsel, mailed by certified and regular mail a letter that acknowledged Huguely's claim for coverage and indicated that Chartis would provide coverage for Huguely's defense in the Civil Litigation pursuant to a full reservation of rights.

51.    In that letter, Chartis specifically advised Huguely that Chartis was undertaking an investigation of the Civil Litigation and its obligations under the Homeowners Policy and the Excess Policy. Chartis further advised Mr. Huguely of his obligations under both the Homeowners Policy and the Excess Policy to cooperate with Chartis' investigation, including submitting to examinations under oath as often as reasonably required. In that letter, Chartis also advised that it would contact Huguely to schedule an examination under oath.

52.    Huguely did not respond to the May 22, 2012 letter.

53.     In December 2012 and January 2013, as part of its ongoing investigation of the facts and circumstances surrounding the allegations contained in the Complaint in the Civil Litigation, Chartis began attempts to schedule an examination under oath of Huguely with Keen Mountain Correctional Center, the penitentiary in which Huguely is incarcerated.

54.     Chartis sought to examine Huguely under oath and ask substantive questions regarding, among other things, the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death.

55.     The Homeowners Policy and the Excess Policy contain coverage exclusions for intended and/or criminal conduct.

56.     Therefore, the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death are critical to Chartis' investigation of allegations set forth in the Civil Litigation, especially in light of the fact that Huguely was convicted for second degree murder in connection with Yeardley R. Love's death and is alleged to have, among other things, grabbed, shook, choked, and/or punched Yeardley R. Love, thereby causing her injuries and ultimate death.

57.     The facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death are also critical to enable Chartis to investigate and evaluate Huguely's defenses in the Civil Litigation and to enable Chartis to determine its obligations under the Homeowners Policy and the Excess Policy.

58.     Chartis also sought to examine Huguely under oath and ask substantive questions regarding his residency at the time of the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death.

59.     Huguely's residency at the time of the alleged altercation was in questions inasmuch as he lived in Charlottesville, Virginia, and Marta Murphy and Huguely's Father maintained separate residences.  Huguely could have been a permanent resident of any of those three residences.

60.     The facts and circumstances surrounding Huguely's residency are critical to enable Chartis to determine its obligations under the Homeowners Policy and the Excess Policy.

61.     On January 31, 2013, Chartis, through undersigned counsel, mailed by certified and regular mail another letter advising Huguely that Chartis intended to take his examination under oath, and that Chartis was attempting to schedule the examination for February 19, 2013. Chartis requested that, pursuant to his obligations under the Homeowners Policy and the Excess Policy, Huguely submit Chartis' request to the Keen Mountain Correctional Center to schedule his examination under oath.

62.     The January 31, 2013 letter specifically advised Huguely that, if he failed to cooperate with Chartis in scheduling his examination under oath, it could constitute a failure to comply with his obligations under the policies, and Chartis reserved the right to deny coverage if he failed to cooperate.

63.     Huguely did not respond to the January 31, 2013 letter, nor did he take any action to assist Chartis in scheduling his examination under oath with Keen Mountain Correctional Center.

64.     On February 11, 2013, Chartis, through undersigned counsel, mailed by overnight delivery and regular mail another letter advising Huguely that his examination under oath had, in fact, been scheduled for February 19, 2013 through Keen Mountain Correctional Center. This letter again specifically advised Huguely that he was obligated under the Homeowners Policy and the Excess Policy to cooperate with Chartis' investigation and sit for an examination under oath.

65.     The February 11, 2013 letter specifically advised Huguely that, if he failed to cooperate with Chartis in appearing for his examination under oath or if he failed to fully respond to undersigned counsel's questions during the examination, Chartis reserved the right to deny coverage for Huguely's failure to cooperate in its investigation.

66.     Huguely did not respond to the February 11, 2013 letter.

67.     However, by letter dated February 12, 2013, attorney Peter C. Grenier, counsel for Interested Parties, Andrew Murphy and Marta Murphy, advised undersigned counsel that Mr. Grenier understood that Huguely was in the process of choosing coverage counsel, and would not be prepared to proceed with his examination under oath on February 19, 2013.

68.     Based on this representation by Mr. Grenier, undersigned counsel postponed Huguely's examination under oath.

69.     By letter dated February 13, 2013, undersigned counsel notified Huguely that Mr. Grenier had advised Chartis that Huguely was in the process of obtaining counsel to represent him in connection with Chartis' investigation and Huguely needed additional time to secure legal counsel.

70.     The February 13, 2013 letter also advised Huguely that Chartis was not proceeding with Huguely's examination under oath on February 19, 2103, but that Chartis intended to reschedule the examination promptly.

71.     The February 13, 2013 letter requested that, when Huguely retained coverage counsel, he have his counsel contact undersigned counsel to schedule Huguely's examination under oath.

72.     The February 13, 2013 letter again specifically advised Huguely that, if he refused to cooperate with Chartis in appearing for his examination under oath or if he failed to fully respond to undersigned counsel's questions during the examination, Chartis reserved the right to deny coverage for Huguely's failure to cooperate in its investigation.

73.     Chartis, through undersigned counsel, rescheduled Huguely's examination under oath through Keen Mountain Correctional Center for April 3, 2013.

74.     On March 13, 2013, Chartis, through undersigned counsel, mailed a letter to Huguely advising him that his examination under oath was rescheduled for April 3, 2013.

75.     The March 13, 2013 letter again specifically advised Huguely of his obligation to appear for his examination under oath and answer undersigned counsel's questions.  The letter also specifically advised Huguely that, if he refused to cooperate with Chartis in appearing for his examination under oath or if he failed to fully respond to undersigned counsel's questions during his examination, Chartis reserved the right to deny coverage for Huguely's failure to cooperate in its investigation.

76.     By letter dated March 28, 2013, attorney Craig S. Cooley, Huguely's counsel in the appeal of his criminal conviction, advised Chartis that he intended to have Huguely "assert

his Fifth Amendment privilege in response to any and all questions relating to the events out of which his criminal charges arose." Mr. Cooley advised that Huguely was "in full agreement with this recommendation."

77. Mr. Cooley further advised in his March 28, 2013 letter that "[u]nless there is some area of questioning unrelated to Ms. Love's passing, events leading up to or following her demise, I suspect the attempt to depose Mr. Huguely would be futile."

78. On March 29, 2013, Mr. Cooley sent by facsimile another letter to undersigned counsel advising that Huguely was declining Chartis' requested visit on April 3, 2013. Mr. Cooley's March 29, 2013 letter specifically stated that "Mr. Huguely will decline the visit on April 3, 2013. He will not respond to any questions on that date or any future date."

79. Mr. Cooley's letter enclosed another letter sent by him to Keen Mountain Correctional Center dated March 29, 2013 in which Mr. Cooley advised Keen Mountain Correctional Center that Huguely was declining Chartis' visit scheduled for April 3, 2013.

80. On April 2, 2013, undersigned counsel received a voicemail from Keen Mountain correctional Center advising that Huguely was declining Chartis' visit scheduled on April 3, 2012.

81. Also on April 2, 2013, undersigned counsel forwarded a letter to Mr. Cooley, Mr. Grenier, and attorney Matthew D. Green, Huguely's attorney in the Civil Litigation, confirming Huguely's refusal to appear for his examination under oath. That letter also confirmed Huguely's position that, even if the examination were to proceed, Huguely would refuse to respond to Chartis' questions regarding the facts and allegations set forth in the Civil Litigation.

82.     In that letter, undersigned counsel advised Huguely, through his attorneys, Mr. Cooley and Mr. Green, that his refusal to appear for his examination under oath and refusal to respond substantively to Chartis' questions constituted a breach of his contractual obligations under the Homeowners Policy and the Excess Policy and prejudiced Chartis' investigation.

83.     On April 12, 2013, Huguely, through Mr. Cooley, again confirmed that "Mr. Huguely will not answer any questions as to the incident or events surrounding the incident of the death of Ms. Love.  Mr. Cooley's letter also stated: "Mr. Huguely will decline any visit or contact with representatives of Chartis Insurance.  This decision will not change."

84.     Huguely is required under the Homeowners Policy and the Excess Policy to cooperate with Chartis' investigation of the facts and circumstances underlying the Civil Litigation.  Such cooperation includes submitting to an examination under oath and answering Chartis' questions regarding the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time.

85.     Inasmuch as Huguely claims to be an insured under the Homeowners Policy and the Excess Policy, he has a contractual obligation to cooperate with Chartis' investigation of the facts and circumstances underlying the Civil Litigation.  Such cooperation includes submitting to an examination under oath and answering Chartis' questions regarding the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time.

86.     Huguely's assertion of his Fifth Amendment privilege and his refusal to cooperate constitutes a breach of his contractual obligations under the Homeowners Policy and the Excess Policy.

87.     Chartis has a right to fully investigate and explore the facts surrounding the Civil Litigations and the demand for coverage under the Homeowners Policy and the Excess Policy.

88.     To date, Chartis has been unable to complete its investigation as a result of Huguely's failure to submit to an examination under oath and respond substantively to Chartis' questions.

89.     Huguely's failure and refusal to cooperate in Chartis' investigation has prejudiced Chartis' ability to investigate the Civil Litigation and its potential coverage obligations in any meaningful manner.

90.     Indeed, only two people had personal knowledge of what occurred during the alleged altercation – Huguely and Yeardley R. Love – and Mr. Huguely is the only one still alive.

91.     Chartis has no means of discovering the facts surrounding the claims in the Civil Litigation other than questioning Huguely in an examination under oath.

92.     Such questioning is critical to determine whether Huguely acted intentionally, criminally, or otherwise in connection with the alleged altercation with Yeardley R. Love.

93.     Huguely is seeking insurance coverage under the Homeowners Policy and the Excess Policy, but is actively depriving Chartis of an opportunity to investigate his claim for coverage.

94.     In light of Huguely's assertion via Mr. Cooley's March 29, 2013 letter that "[h]e will not respond to any questions on that date or any future date[,]" and his additional assertions in Mr. Cooley's April 12, 2013 letter that he will not answer any questions surrounding Ms. Love's death and will decline any visit or contact with representatives from Chartis, Chartis will be unable to complete its investigation at any time in the future.

95.     Chartis has been and will continue in the future to be severely prejudiced by Huguely's failure to submit to an examination under oath and respond substantively to Chartis' questions regarding the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time.

## COUNT I – DECLARATORY JUDGMENT – HOMEOWNERS POLICY

96.     Chartis hereby incorporates by reference Paragraphs 1 through 95 as if fully stated herein.

97.     In light of Huguely's request for coverage under the Homeowners Policy, Chartis is entitled to investigate the facts and circumstances underlying the allegations set forth in the Civil Litigation.

98.     Chartis, through undersigned counsel, did, in fact, undertake an investigation of the facts and circumstances underlying the allegations set forth in the Civil Litigation.

99.     Huguely is required to cooperate with Chartis' investigation by, among other things, submitting to an examination under oath and substantively answering Chartis' questions regarding the allegations made in the Civil Litigation, including the facts and circumstances

leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time.

100.　　Chartis made numerous good faith attempts to obtain the cooperation of Huguely by requesting that he submit to an examination under oath so that Chartis could ask substantive questions relating to the allegations made in the Civil Litigation, including the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time.

101.　　Chartis advised Huguely several times that his failure to submit to an examination under oath, substantively respond to Chartis questions, or otherwise cooperate with Chartis' investigation could result in the denial of insurance coverage under the Homeowners Policy.

102.　　Nonetheless, Huguely declined to sit for Chartis' requested examination under oath and informed Chartis that he would not respond to any of Chartis' questions at the scheduled examination under oath or on any future date.

103.　　Huguely's refusal to submit to an examination under oath and his refusal to substantively respond, now or at any time in the future, to any of Chartis' questions regarding the allegations made in the Civil Litigation, including the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time constitutes a material breach of terms and conditions of the Homeowners Policy to enable Chartis to determine its obligations under the Homeowners Policy.

104.     Huguely's refusal to submit to an examination under oath and his refusal to substantively respond, now and at any time in the future, to any of Chartis' questions regarding the allegations made in the Civil Litigation, including the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time has caused and will continue to cause severe prejudice to Chartis by, among other things, limiting Chartis' ability to investigate and evaluate Huguely's liability and defenses in the Civil Litigation, to develop and or evaluate a strategy for defending Huguely's and Chartis' rights in the Civil Litigation, and to evaluate whether Huguely is owed coverage under the Homeowners Policy.

105.     Because Huguely breached his obligations under the Homeowners Policy and Chartis suffered and will continue to suffer prejudice as a result thereof, Huguely is not entitled to coverage under the Homeowners Policy.

WHEREFORE, Chartis seeks:

1)     A declaration that Chartis has no duty under the Homeowners Policy to defend Huguely from any claim asserted against him by Sharon D. Love in the Civil Litigation or any other claim that otherwise arises out of the alleged physical altercation between Huguely and Yeardley R. Love on May 2-3, 2010 or any injuries suffered by Yeardley R. Love in connection therewith, including her death;

2)     A declaration that Chartis has no duty under the Homeowners Policy to indemnify Huguely for any sums that he becomes liable to pay to Sharon D. Love in the Civil Litigation or as a result of any other claim that otherwise arises out of the alleged physical altercation between

Huguely and Yeardley R. Love on May 2-3, 2010 or any injuries suffered by Yeardley R. Love in connection therewith, including her death; and

      3)      Any further necessary or proper relief as the Court deems appropriate.

## COUNT II – DECLARATORY JUDGMENT – EXCESS POLICY

106.      Chartis hereby incorporates by reference Paragraphs 1 through 105 as if fully stated herein.

107.      In light of Huguely's request for coverage under the Excess Policy, Chartis is entitled to investigate the facts and circumstances underlying the allegations set forth in the Civil Litigation.

108.      Chartis, through undersigned counsel, did, in fact, undertake an investigation of the facts and circumstances underlying the allegations set forth in the Civil Litigation.

109.      Huguely is required to cooperate with Chartis' investigation by, among other things, submitting to an examination under oath and substantively answering Chartis' questions regarding the allegations made in the Civil Litigation, including the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time.

110.      Chartis made numerous good faith attempts to obtain the cooperation of Huguely by requesting that he submit to an examination under oath so that Chartis could ask substantive questions relating to questions regarding the allegations made in the Civil Litigation, including the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time.

111.     Chartis advised Huguely several times that his failure to submit to an examination under oath, substantively respond to Chartis questions, or otherwise cooperate with Chartis' investigation could result in the denial of insurance coverage under the Excess Policy.

112.     Nonetheless, Huguely, through his criminal counsel, declined to sit for Chartis' requested examination under oath and informed Chartis that he would not respond to any of Chartis' questions at the scheduled examination under oath or on any future date.

113.     Huguely's refusal to submit to an examination under oath and his refusal to substantively respond, now or at any time in the future, to any of Chartis' questions regarding the allegations made in the Civil Litigation, including the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time constitutes a material breach of terms and conditions of the Excess Policy to enable Chartis to determine its obligations under the Excess Policy.

114.     Huguely's refusal to submit to an examination under oath and his refusal to substantively respond, now and at any time in the future, to any of Chartis' questions regarding the allegations made in the Civil Litigation, including the facts and circumstances leading up to and surrounding the alleged altercation between Huguely and Yeardley R. Love on May 2-3, 2010 and Yeardley R. Love's death and Huguely's residency at that time has caused and will continue to cause severe prejudice to Chartis by, among other things, limiting Chartis' ability to investigate and evaluate Huguely's liability and defenses in the Civil Litigation, to develop and or evaluate a strategy for defending Huguely's and Chartis' rights in the Civil Litigation, and to evaluate whether Huguely is owed coverage under the Excess Policy.

115.     Because Huguely breached his obligations under the Excess Policy and Chartis suffered and will continue to suffer prejudice as a result thereof, Huguely is not entitled to coverage under the Excess Policy.

WHEREFORE, Chartis seeks:

1)     A declaration that Chartis has no duty under the Excess Policy to defend Huguely from any claim asserted against him by Sharon D. Love in the Civil Litigation or any other claim that otherwise arises out of the alleged physical altercation between Huguely and Yeardley R. Love on May 2-3, 2010 or any injuries suffered by Yeardley R. Love in connection therewith, including her death;

2)     A declaration that Chartis has no duty under the Excess Policy to indemnify Huguely for any sums that either become liable to pay to Sharon D. Love in the Civil Litigation or as a result of any other claim that otherwise arises out of the alleged physical altercation between Huguely and Yeardley R. Love on May 2-3, 2010 or any injuries suffered by Yeardley R. Love in connection therewith, including her death; and

3)     Any further necessary or proper relief as the Court deems appropriate.

Respectfully submitted,


_/s/Stacey A. Moffet_ _____
Stacey A. Moffet (Fed. Bar # 23025)
ECCLESTON AND WOLF, P. C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
moffet@ewmd.com
_Attorney for Chartis Property Casualty Company_


_/s/Richard J. Berwanger, Jr._ _____
Richard J. Berwanger, Jr. (Fed. Bar # 17835)
ECCLESTON AND WOLF, P. C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
berwanger@ewmd.com
_Attorney for Chartis Property Casualty Company_