IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARTIS PROPERTY CASUALTY CO.

    v.

GEORGE W. HUGUELY, V, *ET AL.*

                    :   Civil Action No. DKC 13-1479

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this declaratory judgment action is a motion for summary judgment filed by Plaintiff Chartis Property Casualty Company ("Plaintiff"). (ECF No. 64). The issues have been briefed and a hearing was held on January 10, 2017. For the following reasons, the motion for summary judgment will be granted.

## I.   Background[1]

This case involves the intersection of three actions in which George W. Huguely, V ("Defendant") is the defendant: a criminal case, a civil case, and this insurance coverage case.

### A.   Criminal Case

Early on the morning of May 3, 2010, one of Yeardley Love's roommates found her dead in her bedroom. *Huguely v. Commonwealth*, 63 Va.App. 92, 99-100 (2014). Defendant, who had dated Yeardley Love "on and off" for years, had been drinking

---

[1] Unless otherwise noted, the facts outlined here are undisputed or construed in the light most favorable to Defendant, the non-moving party.

alcohol heavily on May 2 and went to her house late that night. *Id.* at 99, 101.  He admitted to police that he kicked a hole in her bedroom door to gain access to her room, had a physical altercation with her during an argument, and left her bleeding on her bed.  *Id.* at 102 n.4.  In a 2012 trial, a jury in the Circuit Court for the City of Charlottesville, Virginia found Defendant responsible for her death and guilty of second degree murder.  *Id.* at 105.

After his trial, Defendant petitioned for appeal of his conviction to the Court of Appeals of Virginia on numerous grounds, and the Court of Appeals granted Defendant's petition on several procedural issues. (ECF Nos. 24-2; 24-3).  The Court of Appeals later affirmed Defendant's conviction, *Huguely*, 63 Va.App. at 131, and, subsequently, the Supreme Court of Virginia and the Supreme Court of the United States each denied Defendant's petitions for review.  (ECF No. 64-6); *Huguely v. Virginia*, 136 S.Ct. 119 (2015) (mem.).  Defendant has since filed a Petition for Writ of Habeas Corpus in the Charlottesville court where his trial was originally held.  (ECF No. 73-2).  The post-conviction proceedings are ongoing.

   **B.  Civil Case**

On April 26, 2012, interested party Sharon D. Love ("Ms. Love"), as administrator of the estate of Yeardley Love, brought a civil suit against Defendant in the Circuit Court for the City

of Charlottesville. (ECF No. 1-1). Her amended complaint alleges that Defendant was the proximate cause of Yeardley Love's injuries and death. (ECF No. 1-2, at 4). The alternative counts of the complaint include ordinary negligence, "gross negligence – indifference and acting with utter disregard of caution," "willful and wanton negligence – acting with conscious disregard and reckless indifference," "assault and/or battery," and punitive damages. (*Id.* at 4-9). Based on section 8.01-419 of the Virginia Code, the suit alleges Yeardley Love had a life expectancy of another 58.9 years and seeks nearly thirty million dollars in compensatory damages and an additional one million dollars in punitive damages. (*Id.* at 10-11). In November 2015, the circuit court stayed its proceedings to allow this court to act in the instant insurance coverage case, but some discovery between those parties has continued. (ECF No. 73-4, at 2-3). Trial is now set for July 2018. (*See* Case No. DKC-13-3088, ECF No. 25, at 6).

   C.  **Insurance Case**

   The case in this court concerns whether Plaintiff, an insurance company, is contractually obligated to defend and to indemnify Defendant in the Civil Case. Interested parties Marta Murphy and Andrew Murphy, III, Defendant's mother and step-father (together with Defendant, "Respondents"), purchased a homeowners' insurance policy and an excess insurance policy

(together, "the Policies") from Plaintiff.   (ECF No. 1 ¶ 24).[2]
The Policies include broad indemnification provisions that state
that Plaintiff "will pay damages an insured person is legally
obligated to pay for personal injury . . . caused by an
occurrence covered by this policy . . . unless stated otherwise
or an exclusion applies." (ECF No. 64-8, at 15).   In addition
to indemnity, the Policies agree to "pay the costs to defend an
insured person against any suit seeking covered damages . . .
even if the suit is false, fraudulent or groundless." (*Id.*).
After Ms. Love filed her complaint in the Civil Case, Plaintiff
acknowledged Defendant's claim for coverage in that case and
told Defendant that it would provide coverage pursuant to a
reservation of its rights under the Policies.   (ECF No. 59 ¶
54).

     Plaintiff then began an investigation of the matter to
determine its contractual obligations under the Policies.   (*Id.*
¶¶ 55-64).   Plaintiff sought to examine Defendant under oath,
but he has refused to submit to such an examination, asserting
his Fifth Amendment right against self-incrimination.   (*Id.* ¶¶
80-87).   After Defendant's counsel in the Criminal Case told

---

[2] The homeowners' insurance policy and the excess insurance
policy were both in effect from January 25, 2010, until January
25, 2011.   (ECF No. 59 ¶¶ 28, 41).   Where the two policies use
essentially the same language, they are considered together and
referred to as "the Policies" in this opinion.   Where there are
relevant differences to the provisions in each policy, each
policy is identified individually.

Plaintiff that Defendant would "decline any visit or contact with representatives" from Plaintiff, it initiated this suit, naming Respondents and Sharon Love as interested parties and seeking a declaratory judgment that it was not required to defend or to indemnify Defendant in the Civil Case under either of the Policies.  (ECF No. 1).  Plaintiff alleged that Defendant's refusal to cooperate with its investigation violated a provision of the Policies setting out the insured's duties after a loss.  The homeowners' insurance policy requires an insured to "[s]ubmit to a separate examination under oath" "as often as [Plaintiff] reasonably require[s]," and both the homeowners' and  excess insurance policies require an insured to "[a]ssist and cooperate with [Plaintiff] in the conduct of the defense by helping [it] . . . [t]o secure and give evidence and obtain the attendance of witnesses." (*Id.* ¶¶ 36, 49). Plaintiff has claimed that Defendant's refusal to submit to an examination constituted a material breach of the Policies and resulted in actual prejudice to its ability to identify defenses to its coverage obligations, which included issues over Defendant's residency and provisions in the Policies that exclude coverage for intentional or criminal acts. (*Id.* ¶¶ 54-60).

Plaintiff moved for summary judgment on its original complaint on July 3, 2013.  (ECF No. 8).  Respondents moved to

deny or defer consideration of that summary judgment motion (ECF No. 25), and, at the same time, moved to stay the case pending the outcome of Defendant's appeal in the Criminal Case (ECF No. 24). Respondents' motion to stay was joined by Ms. Love. (ECF No. 28). The court granted Respondents' motion to stay proceedings pending his criminal appeal because: (1) the Virginia Court of Appeals had accepted multiple issues for appellate review in the Criminal Case, (2) the Insurance Case could benefit from the factual development in the Criminal Case, and (3) the court in the Civil Case appeared likely to stay that case. (ECF No. 36, at 7-10). Among the reasons favoring the stay, the court noted that "resolution of the Criminal Case may clarify the issues for which [Plaintiff] is claiming relief: [Defendant's] criminal acts could become a reason for denying coverage." (*Id.* at 10).

On January 5, 2016, after Defendant had exhausted all direct appeals in his criminal proceedings, this case was reopened. (ECF No. 56). Plaintiff's unopposed motion for leave to amend its complaint was granted. Plaintiff added two new counts seeking a declaratory judgment that it was not required to defend or to indemnify Defendant under either policy because the Civil Case resulted from his commission of a criminal act. (ECF No. 59). Under the homeowners' insurance policy, coverage does not extend to personal injuries "resulting from any

criminal, willful, intentional or malicious act," and, under the excess insurance policy, coverage does not extend to injuries "[a]rising out of any criminal, willful, fraudulent, dishonest, intentional, or malicious act" (together, "the Exclusions"). (*Id.* ¶¶ 39, 52).[3]   Plaintiff then filed the instant motion for summary judgment, arguing that the Exclusions and Defendant's failure to cooperate each provide an independent basis to deny coverage.   (ECF No. 64).[4]   Respondents and Ms. Love responded in opposition, and Plaintiff replied.   (ECF Nos. 73; 75; 76). After reviewing the motion papers, the court provided the parties with some tentative conclusions and requested supplemental briefing on several issues.   (ECF No. 79).   On January 10, 2017, the court held a joint hearing on the instant motion and a motion for summary judgment in case DKC-13-3088 by

---

[3] Neither party has argued that the terms "resulting from" and "arising out of" are materially distinct or that the two exclusions should be treated differently with regard to criminal acts.   The two exclusions are thus considered together in this opinion.

[4] Although it does not challenge the issue in this motion, Plaintiff has reserved the right to challenge whether Defendant qualifies as an "insured person" under the Policies.   An "insured person" is defined as "[the persons named in the Policies] or a family member," and a "family member" is defined as "a person related to [the named insured] by blood, marriage or adoption that lives [with the named insured]."   Plaintiff notes that Defendant's refusal to answer questions under oath has prevented it from being able to determine his residency as it relates to this provision of the Policies.   (ECF No. 59 ¶¶ 62-64).   Respondents have refuted this contention, pointing out that both Mr. and Mrs. Murphy have been deposed by Plaintiff. (ECF No. 73, at 20).

State Farm Fire and Casualty Company, which provided another insurance policy to Mr. Murphy under which Defendant has claimed coverage as an insured. (*See* Case No. DKC-13-3088, ECF No. 1).

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact. *Liberty Lobby*, 477 U.S. at 248-50.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 249.  In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."

*Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

## III. Applicable Law

In diversity actions, a district court applies the substantive law and choice of law rules of the state in which the court sits. *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 605 (D.Md. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, (1938)). In contract claims, Maryland applies the doctrine of *lex loci contractus*, meaning that the law of the place where the contract was made applies. *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529 (1992). "The *locus contractus* is the place where the last act is performed which makes an agreement a binding contract." *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 241 Md. 58, 65-66 (1965). In an insurance contract, the delivery of the policy and the payment of the premiums constitute these "last acts." *Id.* (citing *Sun Ins. Office v. Mallick*, 160 Md. 71, 81 (1931)). Plaintiff has provided undisputed evidence that Respondents received the Policies at their residence in Maryland. (ECF No. 64-12, at 2).[5] Therefore, Maryland substantive law applies to the contract dispute here.

---

[5] The Policies covered residences in both California and Maryland and may have also been delivered to California. (ECF No. 64-12, at 2). Because all parties have applied Maryland law in their papers throughout this litigation and neither Respondents nor Ms. Love disputes the fact that the Policies were received in Maryland, Maryland law will be applied.

Maryland law does not, however, govern procedural rules in this court, even when jurisdiction is based on diversity. The parties failed to account for the distinction between substantive law and procedural rules in their initial papers and presented arguments based solely on Maryland law, which does not govern certain aspects of the instant dispute, as noted below.

## IV. Denial of Coverage Based on a Criminal Act

In Maryland, insurance policies are to be construed pursuant to "ordinary principles of contract interpretation." *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655 (2002). Thus, the words used in an insurance policy should be given "their usual, ordinary, and accepted meaning" – i.e., the "meaning a reasonably prudent layperson would attach to the term." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779 (1993). Where the provisions of an insurance policy are unambiguous, the meaning of the terms is determined by the court as a matter of law. *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305 (2000).

The two Exclusions bar coverage for liability "resulting from any criminal, willful, intentional or malicious act" and "[a]rising out of any criminal, willful, fraudulent, dishonest, intentional, or malicious act," respectively. According to Plaintiff, "the exclusive basis of Sharon D. Love's claims in the Civil [Case] is the injury and harm caused by [Defendant] to

10

[Yeardley] Love that ultimately resulted in Love's death." (ECF No. 64-1, at 13). Plaintiff is clearly correct that Ms. Love's suit "results from" and "arises out of" Defendant's acts on the night of Yeardley Love's death. Each count of Ms. Love's complaint is based on that incident. (ECF No. 1-2 ¶¶ 19, 27, 36, 43, 48). Respondents themselves admitted that the allegations in Ms. Love's complaint are based on "the same facts and circumstances underlying [his] criminal proceedings." (ECF No. 73, at 4).

Plaintiff's basic argument for summary judgment is simple. Plaintiff has introduced undisputed evidence that Defendant was convicted of second degree murder. Plaintiff contends that "Defendant's conviction for second degree [murder] . . . establish[es] that his acts . . . in connection with Love's death were criminal in nature." (ECF No. 64-1, at 18). Because the Civil Case is based on those same actions, Plaintiff contends that any liability it will incur in the Civil Case resulted from Defendant's criminal act of second degree murder, which means he is not entitled to coverage under the Policies.

A.   **Duty to Pay Damages**

1.   **Interpreting the Exclusion**

Whether the Plaintiff has a duty to pay damages in the Civil Case thus depends on whether its evidence of what happened that night – namely, Defendant's criminal conviction – is

11

sufficient to show that he committed a criminal act under the Policies.   Giving the words their ordinary meaning, a "criminal act" is any act prohibited by a criminal law.   *See Nationwide Mut. Ins. Co. v. Jones*, No. JFM-05-2792, 2006 WL 361336, at *4 (D.Md. Feb. 15, 2006) (interpreting a criminal acts exclusion to mean an act "defined as criminal by Maryland law"); *see also Allstate Ins. Co. v. Burrough*, 120 F.3d 834, 840 (8th Cir. 1997) (interpreting a criminal acts exclusion to mean an act "defined as criminal by the Arkansas Criminal Code").   Although an issue might arise if the criminal laws in the state where the act occurred differed from the criminal laws of the state of insurance, both Maryland and Virginia criminalize second degree murder and define it in the same way as pertinent to the conduct underlying Defendant's conduct.   *Compare* Md.Code Ann., Criminal Law §2-204 (West 2002), *with* Va.Code Ann. § 18.2-32 (1998).[6]

Attempting to give significance to Defendant's intoxication on the night of Yeardley Love's death, Ms. Love devotes a large portion of her opposition to the motion for summary judgment to arguing that the Exclusions here apply only to intentional criminal acts.   In her view, even if the evidence shows that

---

[6] Both states also reject voluntary intoxication as a defense for second degree murder. *See, e.g.*, *Hook v. State*, 315 Md. 25, 28-29 (1989); *Wright v. Commonwealth*, 234 Va. 627, 629 (1988).  For this reason, Ms. Love's arguments that Defendant's voluntary intoxication creates a dispute of fact over his intent are not material to whether he committed the act of second degree murder.

Defendant committed a crime, the Exclusions from coverage are not triggered unless that criminal act was also intentional, which, she further argues, cannot be proved solely by Defendant's conviction for second degree murder.

Ms. Love first points out that the portions of the Exclusions that mention criminal acts appear under the heading "Intentional Acts." (ECF No. 75, at 13-15). She also suggests that the headings should be read continuously with the text beneath them as a "complete thought" in the excess insurance policy. (*Id.* at 14). Applying this method, the language of that exclusion would bar coverage for an "Intentional Act [a]rising out of any criminal . . . act." (*Id.*). Finally, reading the provisions of the Exclusions as part of the broader contract, Ms. Love asserts that the Policies "clearly provide[] coverage for unintentional or negligent acts – even if those same acts also may happen to constitute a crime." (*Id.* at 11). She points to *Young v. Brown*, 658 So.2d 750, 754 (La.Ct.App. 1995), in which a Louisiana court stated that "[t]he term 'criminal acts,' as used in the coverage exclusion is susceptible of more than one meaning." The *Young* court held that, despite the disjunctive text, an exclusion of coverage for "the intentional or criminal acts of an insured person" required that the criminal acts at issue be intentional as well. (ECF No. 75, at 13-14). According to Ms. Love, the Exclusions are at

least ambiguous in the context of insurance law as to whether intent is required, and, therefore, summary judgment cannot be granted.

Plaintiff counters that an ambiguous title or heading does not create ambiguity in the contract where it is followed by clear specific language. *Bernhardt v. Hartford Fire Ins. Co.*, 102 Md.App. 45, 55 (1994); *see also Berretta USA Corp. v. Fed. Ins. Co.*, 17 F.App'x 250, 255 (4th Cir. 2001) (unpublished opinion). It also asserts that Ms. Love's "complete thought" method to reading the contract is "nonsensical and entirely unsupported by Maryland law." (ECF No. 76, at 13). Plaintiff points out that a "complete thought" reading of the excess insurance policy exclusion would perplexingly bar coverage for an "Intentional Act [a]rising out of any . . . intentional . . . act." (ECF No. 76, at 13). In fact, a closer look at the Policies shows that Ms. Love's method fails to account for the language prior to the numbered headings of excluded acts, which states, "This insurance does not provide coverage for liability, defense costs or any other cost or expense . . . ." (ECF No. 64-11, at 15). Read in full context, this prior language actually forms complete thoughts with each of the ensuing provisions, so long as the headings are not included. For example, when read this way, the Exclusion in the excess policy reads, "This insurance does not provide coverage for liability,

defense costs or any other cost or expense . . . [a]rising out of any criminal, willful, fraudulent, dishonest, intentional, or malicious act." Looking at the other numbered headings, this method makes complete sentences without the headings and complete gibberish with them inserted. (*See, e.g.*, ECF No. 64-11, at 15 ("This insurance does not provide coverage for liability, defense costs or any other cost or expense . . . *3. Watercraft* [a]rising out of the ownership, maintenance, use, operation, loading or unloading of any watercraft . . . ." (emphasis added to heading)).

Furthermore, the vast majority of other courts either have refused to follow the *Young* holding or independently ruled that clauses that cover both intentional and criminal acts like the one here do not require intent for criminal acts. *See Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 8-12 (1st Cir. 2004); *Allstate Ins. Co. v. Brown*, 16 F.3d 222, 225 (7th Cir. 1994); *Allstate Ins. Co. v. Burrough*, 914 F.Supp. 308, 312 (W.D.Ark. 1996); *Allstate Ins. Co. v. Barnett*, 816 F.Supp. 492, 497 (S.D.Ind. 1993); *Hooper v. Allstate Ins. Co.*, 571 So.2d 1001, 1003 (Ala. 1990); *20th Century Ins. Co. v. Schurtz*, 112 Cal.Rptr.2d 547, 553-54 (Cal.Ct.App. 2001); *Allstate Ins. Co. v. Schmitt*, 238 N.J.Super. 619, 630 (1990); *Steinke v. Allstate Ins. Co.*, 86 Ohio App. 798, 803-04 (1993); *Allstate Ins. Co. v. Sowers*, 97 Or.App. 658, 660-61 (1989); *Allstate Ins. Co. v.*

*Peasley*, 131 Wash.2d 420, 428-430 (1997).  The *Young* court also suggested that *any* criminal acts exclusion – *i.e.* even one that prohibited criminal acts alone as opposed to the "intentional or criminal acts" clause at issue in that case – would not cover unintentional criminal acts because "[l]osses . . . resulting from negligent, non-intentional conduct are precisely the losses a liability policy buyer expects to insure against." *Young*, 658 So.2d at 753-754.  The Court of Special Appeals of Maryland explicitly refused to accept such an argument in *Medical Mutual Liability Insurance Society of Maryland v. Azzato*, 94 Md.App. 632, 640-41 (1993), holding that a criminal acts provision excludes coverage for injuries arising out of acts that "constitute both [negligent] malpractice and criminal behavior." As that court pointed out:

> All activity that is expressly excluded from coverage in this or any other insurance policy would, at least arguably, be covered if not so excluded.  Thus, it would make no sense to interpret this policy to be ambiguous simply because the activity it excludes would, absent the exclusion, be covered.

*Id.*[7]  Ms. Love's argument thus runs contrary to Maryland law. The criminal act provisions in the Exclusions do not require that the criminal act be intentional.

─────────────

[7] In addition to Maryland and the jurisdictions cited in the previous paragraph, more courts have questioned this notion from *Young*.  *See Am. Family Mut. Ins. Co. v. White*, 204 Ariz. 500, 503 n.1 (Ariz.Ct.App. 2003) (rejecting *Young* and citing numerous

###  2.   **Defendant's Criminal Conviction**

Without directly proposing that *res judicata* or collateral estoppel should be applied here, Plaintiff argues that Defendant's criminal conviction "conclusively" shows that he has committed a criminal act.  (ECF No. 76, at 5).  To the degree that Plaintiff attempts to prevent the relitigation in this case of the issues decided in another case, its argument could be construed as an application of collateral estoppel.  At the motions hearing, Plaintiff acknowledged that collateral estoppel is inapplicable in the instant case, because, under Virginia law which applies to this issue, courts must "adhere[] to the principle of mutuality which holds that 'a litigant is generally prevented from invoking the preclusive force of a judgment unless he would have been bound had the prior litigation of the issue reached the opposite result,'" *Rawlings v. Lopez*, 267 Va. 4, 5 (2004) (quoting *Norfolk & W. Ry. v. Bailey Lumber Co.*, 221 Va. 638, 640 (1980)).  Where jurisdiction is based on diversity, "the law of the state where the District Court sits . . . controls questions of res judicata and collateral estoppel." *St. Paul Fire & Marine Ins. Co. v. Lack*, 476 F.2d 583, 585 (4th Cir. 1973).  This court applies Maryland law, and Maryland, in turn, applies the preclusion rules from the state where the

cases not cited here); *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1047-48 (Colo. 2011) (distinguishing *Young*); *Am. Family Mut. Ins. Co. v. Hadley*, 264 Neb. 435, 443-46 (2002) (distinguishing *Young*).

original judgment was rendered. In this case, then, Virginia law applies to Defendant's Virginia conviction. *See Rourke v. Amchem Products, Inc.*, 384 Md. 329, 347-352 (2004) ("[W]e hold that, in applying full faith and credit to the Virginia judgment, a Maryland court must treat the judgment precisely the same as it would be treated in a Virginia court, and that requires that we apply the preclusion rules that would be applied in Virginia."). Although most jurisdictions have allowed the use of non-mutual collateral estoppel, Virginia does not. *Rawlings*, 267 Va. at 4. Because Plaintiff was not a party to Defendant's criminal case, it cannot rely on collateral estoppel.

Next, the parties argue at length over whether Defendant's conviction is admissible as evidence, and to what effect. Although the parties cited to Maryland cases discussing the admissibility of criminal convictions, admissibility in this court is based on the Federal Rules of Evidence. The United States Court of Appeals for the Fourth Circuit has affirmed that the Federal Rules of Evidence are "validly enacted procedural rules" that govern even in diversity cases. *E.g.*, *Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 109 (4th Cir. 1995).

> Of all the procedural and quasi-procedural rules and practices that are applied in the federal courts, the Federal Rules of Evidence are the least affected by the doctrine announced in *Erie Railroad Company v. Tompkins*. The principle that governs

> today is stated easily. . . . [I]f an
> Evidence Rule covers a disputed point of
> evidence, the Rule is to be followed, even
> in diversity cases, and state law is
> pertinent only if and to the extent the
> applicable Rule makes it so.

19 Charles Alan Wright, Arthur Miller, *et al.*, Federal Practice

and Procedure § 4512 (3d ed. 2016).

Federal Rule 803(22) creates an exception to the hearsay

rule in civil cases for:

> Evidence of a final judgment of conviction
> if:
> (A) the judgment was entered after a trial
> or guilty plea, but not a nolo contendere
> plea;
> (B) the conviction was for a crime
> punishable by death or by imprisonment for
> more than a year; [and]
> (C) the evidence is admitted to prove any
> fact essential to the judgment. . . .
>
> The pendency of an appeal may be shown but
> does not affect admissibility.

Defendant's conviction meets these requirements.  First, his

judgment is final despite his ongoing post-conviction

proceedings.  Because the Rule allows consideration of a

judgment even as it is being directly appealed, collateral

attack does not preclude it from being sufficiently final here.

Second, the judgment was entered after a trial.  Third,

Defendant was convicted of second degree murder under section

18.2-32 of the Virginia Code, a crime punishable by imprisonment

for more than a year.[8]   Finally, the Rule mandates that the conviction must be "admitted to prove any fact essential to the judgment."   Here, Plaintiff alleges that Defendant's liability in the Civil Case arises out of his commission of the criminal act of second degree murder.   It was essential to Defendant's conviction for second degree murder for the jury to find that he had committed a malicious killing.   *Turner v. Commonwealth*, 23 Va.App. 270, 274 (1996) (defining second degree murder under Virginia law).   The evidence of his conviction is being admitted to prove that he committed that same criminal act.   Therefore, the final requirement has been met, and Defendant's conviction is admissible in this court.   At the motions hearing neither Respondents nor Ms. Love contested the admissibility of Defendant's conviction under the Federal Rules.

The Advisory Committee's note on Rule 803(22) provides clarity as to the effect of such evidence:

> When the status of a former judgment is under consideration in subsequent litigation, three possibilities must be noted: (1) the former judgment is conclusive under the doctrine of res judicata, either as a bar or a collateral estoppel; or (2) it is admissible in evidence for what it is worth; or (3) it may be of no effect at all. . . . The rule does not deal with the substantive effect of the judgment as a bar or collateral estoppel. When, however, the doctrine of res judicata does not apply to make the judgment either a bar or a

---

[8]   Defendant was sentenced to twenty-three years imprisonment.

> collateral estoppel, a choice is presented
> between the second and third alternatives.
> The rule adopts the second for judgments of
> criminal conviction of felony grade. This
> is the direction of the decisions, Annot.,
> 18 A.L.R.2d 1287, 1299, which manifest an
> increasing reluctance to reject *in toto* the
> validity of the law's factfinding processes
> outside the confines of res judicata and
> collateral estoppel. While this may leave a
> jury with the evidence of conviction but
> without means to evaluate it, as suggested
> by Judge Hinton, Note 27 Ill.L.Rev. 195
> (1932), it seems safe to assume that the
> jury will give it substantial effect unless
> defendant offers a satisfactory explanation,
> a possibility not foreclosed by the
> provision.

Given this description, Defendant's conviction is admissible as rebuttable evidence here for what it is worth. *See also Semler v. Psychiatric Inst. of Washington, D.C.*, 538 F.2d 121, 127 (4th Cir. 1976) (holding that the district court was "free to assign . . . the weight it saw fit" to evidence submitted pursuant to a conviction under Rule 803(22)).

In response to this standard, Respondents suggest that what Defendant's conviction is worth should be viewed in light of *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396 (1975). The *Brohawn* court explained that a guilty plea may be admissible in a subsequent civil proceeding, but the criminal defendant should be given an opportunity to explain the plea in the civil action. *Id.* at 403-04. Respondents' argument is that if a guilty plea, which acts as an admission and is followed by a conviction, is not conclusive, a conviction by a jury should not be conclusive

either.   For that reason, they argue, the court should reject
Plaintiff's   contention   that   Defendant's   conviction   "thereby
establish[es]   conclusively   that   [Defendant]   acted   criminally   in
causing the death of Love." (ECF No. 64-1, at 14).

There   are   significant   differences   between   a   criminal
conviction based on a guilty plea and one based on a verdict in
a   jury   trial,   but   delving   into   them   is   not   required   here.   The
Advisory   Committee's   note   clarifies   that   the   conviction   should
not   be   conclusive,   suggesting   that   a   fact-finder   might   give   a
conviction   "substantial   effect"   but   noting   that   a   defendant
might   offer   a   "satisfactory   explanation"   for   the   conviction.
The   summary   judgment   standard   also   gives   Respondents   leeway.   At
this   stage   in   the   case,   if   Respondents   or   Ms.   Love   presented   any
evidence   refuting   the   conviction,   there   might   be   a   dispute   over
a   material   fact,   and   Plaintiff's   motion   could   not   succeed.   Both
the   motion   papers   and   the   motions   hearing   have   given   the   parties
the   opportunities   described   in   *Brohawn*.   At   oral   argument,   the
court   specifically   asked   Respondents   and   Ms.   Love   whether   they
forecast   evidence   to   rebut   the   facts   underlying   Defendant's
conviction;   neither   party   argued   that   he   had   not   committed   the
murder   of   Ms.   Love.   By   way   of   Defendant's   criminal   conviction,
then,   Plaintiff   has   produced   evidence   that   Defendant   committed
the   criminal   act   of   second   degree   murder,   and   that   the   same   act
or   acts   gave   rise   to   his   potential   liability   in   the   Civil   Case.

22

Neither Respondents nor Ms. Love have presented any evidence disputing these facts.

### C.   Respondents' Rule 56(d) Motion

Respondents contend in their opposition that they have not presented any evidence to rebut Plaintiff's arguments because the parties have not yet engaged in discovery.  Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011).  The Fourth Circuit has held, however, that "the party opposing summary judgment cannot complain that summary judgment was granted without discovery unless . . . more time was needed for discovery."  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition" without discovery.  Fed.R.Civ.P. 56(d); *see Harrods*, 302 F.3d at 244-45.

"Notably, 'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'"  *Hamilton v. Mayor & City Council of Balt.*, 807 F.Supp.2d 331, 342 (D.Md. 2011) (quoting

*Young v. UPS, Inc.*, No. DKC-08-2586, 2011 WL 665321, at *20 (D.Md. Feb. 14, 2011) *aff'd*, 707 F.3d 437 (4th Cir. 2013), *vacated on other grounds*, 135 S.Ct. 1338 (2015)). The party seeking discovery must identify "specific facts that were not already available to him." *McKinnon v. Blank*, No. DKC-12-1265, 2013 WL 781617, at *12 (D.Md. Feb. 23, 2013); *see also Boyd v. Guiterrez*, 214 F.App'x 322 (4th Cir. 2007) (per curiam) (affirming denial of a 56(d) motion because appellant's affidavit had "failed to identify any facts essential to his opposition that were not already available to him" from prior administrative proceedings); *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F.Supp.2d 470, 481 n.16 (D.Md. Feb. 5, 2013) (quoting *Price ex rel. Price v. Western Resources*, Inc., 232 F.3d 779, 783 (10th Cir. 2000), for the proposition that a Rule 56(d) affidavit must "identify[ ] the probable facts not available and what steps have been taken to obtain these facts"). The affidavit must also provide the court with "a reasonable basis to suggest that the requested discovery would reveal triable issues of fact." *McKinnon*, 2013 WL 781617, at 10; *Nana-Akua*, 921 F.Supp.2d at 481 n.16; *see also Richard v. Leavitt*, 235 F.App'x 167, 167 (4th Cir. 2007) (affirming denial of a Rule 56(d) request when the plaintiff failed to provide a basis for believing that the information sought actually existed). Put simply, Rule 56(d) does not authorize "fishing

24

expedition[s]." *Morrow v. Farrell*, 187 F.Supp.2d 548, 551 (D.Md. 2002), *aff'd*, 50 F.App'x 179 (4th Cir. 2002); *see also Wright v. Eastman Kodak Co.*, 550 F.Supp.2d 371, 382 (W.D.N.Y. 2008), *aff'd*, 328 F.App'x 738 (2[d] Cir. 2009) ("While a Rule 56[(d)] discovery request may be granted to allow a plaintiff to 'fill material evidentiary gaps,' it may not be premised solely on speculation as to evidence which might be discovered[.]").

Respondents labeled their response to Plaintiff's motion for summary judgment as a "memorandum in opposition to Plaintiff's second motion for summary judgment or, in the alternative, motion to deny or defer judgment pending discovery," and filed a declaration by their lawyer stating that further discovery is necessary "to find evidence that will allow [Defendant] to fully respond" to Plaintiff's motion. (ECF Nos. 73, at 1; 73-5, at 3). In the declaration and in a corresponding section of their opposition to summary judgment, Respondents suggest that the necessary discovery would include "locating and deposing . . . any neighbors who heard or saw anything in Ms. Love's residence on the night of her death; locating and deposing witnesses who interacted with [Defendant] or [Yeardley] Love on the night of the incident who could speak to their conditions and state of mind; locating and deposing law enforcement officers engaged in the investigation of [Yeardley] Love's death . . . ; and obtaining experts who could opine as to

[Yeardley] Love's cause of death, [Defendant's] ability to form intent, and the criminal standards which may or may not be applicable." (ECF No. 73, at 14).

Although inquiry into these topics could be relevant in determining whether Defendant committed second degree murder, Respondents have not explained why discovery is needed to collect such information. None of the information above is in Plaintiff's possession, and all of these inquiries would undoubtedly have been relevant to Defendant in his Criminal Case. Respondents also acknowledge that "much of the discovery which [they] would need in this action has already occurred" in the Civil Case. (ECF No. 73, at 14). But despite the completion of Defendant's Criminal Case and the ongoing discovery in his Civil Case, Respondents have not provided any evidence in opposition to Plaintiff's motion that refutes his criminal conviction or explained what they expect to find in discovery. In short, they have not articulated why discovery is needed to obtain such evidence or given the court any reason to believe that there may be evidence undermining Defendant's criminal conviction that they could obtain with discovery.

Respondents' 56(d) affidavit mentions only one piece of discoverable information that they aver is not available to them: "what, if any, standard for criminal behavior [Plaintiff] is using in an attempt to disclaim coverage under the 'criminal

26

acts' exclusion." (ECF No. 73-5, at 3). Respondents' counsel declares that he will need to depose Plaintiff's designee for this information because it "is something that can only be known by Plaintiff and something that is essential for [Defendant] to understand in order to fully and effectively respond." (*Id.*). According to Respondents, until Defendant knows what criminal act Plaintiff is "charging" him with, they cannot formulate a response. Assuming *arguendo* that Plaintiff must identify the specific criminal acts it believes Defendant committed, it has quite clearly identified second degree murder as the criminal act from which the liability in the Civil Case arose. Given that the whole of Plaintiff's evidence for its exclusion argument in the present motion is Defendant's criminal conviction for second degree murder, there is little room for confusion about what crime Plaintiff is alleging here. Respondents therefore cannot substantiate a need for discovery by seeking that information from Plaintiff, and their affidavit under Rule 56(d) fails to justify deferring consideration of the summary judgment motion presently.

Accordingly, Defendant's unrebutted criminal conviction provides sufficient evidence that he committed a criminal act when he caused the death of Yeardley Love. Plaintiff is thus entitled to summary judgment with regard to its duty to pay damages in the underlying civil suit.

27

**B.   Duty to Defend**

The fact that Plaintiff is not obligated to pay damages in the underlying suit does not necessarily entitle it to summary judgment on all of its claims.  Insurance policies that impose a duty to defend along with liability coverage act as "'litigation insurance' as well, protecting the insured from the expense of defending suits brought against him." *Brohawn*, 276 Md. at 410. Even where an insurer's duty to defend against a suit is based on its potential liability in that suit, then, the duties are "distinct conceptually." *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 15 (2004).  Because the duty to defend covers even false, fraudulent, and groundless suits (ECF No. 64-8, at 15), it is the allegations in the tort suit, not other discernable facts, that govern this inquiry.

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193 (1981).  Because the duty to defend is a "broader" duty, *Walk*, 382 Md. at 15, if there is any doubt as to "whether or not the

allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in [the] insured's favor." *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107 (1995) (quoting *U.S. Fid. & Guar. Co. v. Nat'l Paving Co.*, 228 Md. 40, 54 (1962)).

As to whether Ms. Love's allegations "potentially bring the tort claim within the policy's coverage," *Pryseski*, 292 Md. at 193, Plaintiff argues that if it has no duty to pay damages because of Defendant's conviction, there can be no potentiality of coverage creating a duty to defend. (ECF No. 82, at 3).[9] Respondents counter that if Defendant's conviction were overturned in his pending habeas proceedings and he was acquitted in a subsequent trial, then he would no longer be excluded under the criminal acts provision but might still be liable to Ms. Love on her negligence claims. (ECF No. 83, at 5). They maintain that even if the likelihood of this sequence of events is low, Maryland law commands that "any potentiality of coverage, no matter how slight, gives rise to a duty to defend." *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 226

---

[9] Although Maryland courts generally apply the "exclusive pleading rule," which dictates that "a determination of a potentiality of coverage [should be] made solely by reference to the insurance policy and the complaint," *Cochran*, 337 Md. at 106, the parties agree that Defendant's criminal conviction can be considered here, at least if it qualifies as a firmly established judicial decree. (See ECF Nos. 82, at 6-7; 83, at 4 n.4).

(1997).   They point to *Grain Dealers Mut. Ins. Co. v. Marino*, 200 Cal.App.3d 1083 (Cal.App.6[th] Dist. 1988), in which the lower court held that there was no duty to defend under an intentional acts exclusion based on collateral estoppel from the insured's criminal trial, and the appellate court reversed that decision after the insured's habeas proceeding was successful.   If Defendant's conviction were similarly vacated, Respondents argue, Plaintiff would have a duty to defend, and, therefore, a slight potentiality exists.

   *Marino* does not support Respondents' position.   The trial court in *Marino* ruled in the insurer's favor while the insured's habeas proceeding was pending or forthcoming.   The appeals court did not vacate that decision during the pendency because of the potential for a duty to defend, but rather stayed the appellate review until after the insured had succeeded in his habeas challenge.   The *Marino* court relied on the Restatement, which stated:

> If, when the earlier judgment is set aside or reversed, the later judgment is still subject to a post-judgment motion for a new trial or the like, or is still open to appeal, or such motion has actually been made and is pending or an appeal has been taken and remains undecided, a party may inform the trial or appellate court of the nullification of the earlier judgment and the consequent elimination of the basis for the later judgment. The court should then normally set aside the later judgment.

*Marino,* 200 Cal.App.3d at 1089 (citing Restatement (Second) of Judgments § 16 cmt. c (Am. Law Inst. 1982)).  The appellate court's holding was not that the trial court had wrongly decided the case, but that, *after* the criminal conviction had been vacated, there was no final judgment on the merits, which had been critical to the trial court's use of *collateral estoppel.* *Id.* at 1088-89.  Furthermore, that case is distinguishable because the parties in *Marino* had produced at least some evidence that the insured's conduct was not intentional, *id.* at 1087, whereas none of the parties have presented any evidence that Defendant's conduct here was not criminal.

Respondents also read too much into the phrase "no matter how slight" from *Litz*.  When applying the potentiality standard, the *Litz* court cited to a prior opinion of the Court of Appeals that describes the threshold as "reasonable potential."  *Litz*, 346 Md. at 231 (citing *Cochran*, 337 Md. at 112).  Based on the facts of that case, the court found that the insured *was covered*, *id.* at 230, not that he might be, and therefore it had no trouble at all finding a "reasonable potential."  *Id.* at 231. The "no matter how slight" language came directly from a law review article that also notes that the potentiality rule is construed broadly in order to provide protection to the insured even when the third party's claims are "groundless, false, or fraudulent."  Andrew Janquitto, *Insurer's Duty to Defend in*

31

*Maryland*, 18 U.Balt.L.Rev. 1, 13-14 (1988).  The article later summarizes the "maxims that should guide the inquiry into whether allegations create a potentiality" and states that the duty to defend arises "if there is a reasonable possibility" that the claim is within the scope of the policy.  *Id.* at 16.

Moreover, Maryland courts have firmly established that a criminal defendant's constitutional rights against self-incrimination do not extend beyond his direct appeals.  *See Archer v. State*, 383 Md. 329, 344 (2004).  There is no reason to think that Maryland would hold that the same negligible and nearly unending potential for habeas relief warrants an ongoing duty to defend, especially where, as here, Respondents have not argued Defendant's actual innocence.  Accordingly, Plaintiff is entitled to summary judgment with regard to its duty to defend as well.[10]

## V.  Declaratory Judgment While State Action Is Pending

Finally, Respondents argue that declaratory judgment is not appropriate at this time, given the ongoing nature of the Civil Case.  In their opposition they rely on Maryland's "*Brohawn* rule," which states that declaratory judgments are inappropriate in insurance coverage cases where "the issue upon which coverage is denied [is] the ultimate issue to be determined in a pending

---

[10] Because Plaintiff is entitled to summary judgment on its criminal exclusions provision arguments, it is not necessary to address Plaintiff's failure to cooperate arguments.

suit by a third party." *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 406 (1975). *Brohawn* is inapplicable here, however, because "[f]ederal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even when the case is under the court's diversity jurisdiction." *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990); *see also Icarom, PLC v. Howard Cty., Md.*, 904 F.Supp. 454, 458 (D.Md. 1995) (refusing to apply Maryland's declaratory judgment rules from *Allstate Ins. Co. v. Atwood*, 319 Md. 247 (1990), a more recent articulation of *Brohawn*).

Under federal law, district courts have "some measure of discretion [as to whether] to entertain a declaratory judgment action that is otherwise properly within its jurisdiction." *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 375 (4th Cir. 1994). The Fourth Circuit has held that district courts should not entertain a declaratory judgment action during the pendency of a related state proceeding "when the result would be to 'try a controversy by piecemeal, or to try particular issues without settling the entire controversy.'" *Mitcheson v. Harris*, 955 F.2d 235, 239 (4th Cir. 1992) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). A court must consider four factors in deciding whether to make a declaratory judgment in such a case:

> (i) the strength of the state's interest in having the issues raised in the federal

33

> declaratory action decided in the state
> courts; (ii) whether the issues raised in
> the federal action can more efficiently be
> resolved in the court in which the state
> action is pending; (iii) whether permitting
> the federal action to go forward would
> result in unnecessary "entanglement" between
> the federal and state court systems, because
> of the presence of "overlapping issues of
> fact or law[;]"[] and (iv) whether the
> declaratory judgment action is being used
> merely as a device for "procedural fencing."

*Myles Lumber Co. v. CNA Financial Corp.*, 233 F.3d 821, 824 (4th Cir. 2000) (quoting *Nautilus*, 15 F.3d at 377).

After the court provided the parties with the appropriate legal standard, neither Ms. Love nor Respondents argued that declaratory judgment would be inappropriate in this case.[11] Weighing the state court's interest in resolving coverage issues as part of the tort litigation, the Fourth Circuit held in *Mitcheson* that the district court should have refrained from deciding a coverage case where *Brohawn* might preclude a Maryland

---

[11] Ms. Love did not file supplemental briefing in this case and confirmed at the motions hearing that she has no objection to handling the declaratory judgment action prior to the Civil Case. Respondents disputed the appropriateness of declaratory judgment in their opposition in the State Farm case but did not dispute it in their supplemental opposition here, which was filed the same day as the State Farm opposition. At oral argument, Respondents' counsel mentioned the *Mitcheson* case, but argued only that if the court granted declaratory judgment now and Defendant was later granted habeas relief, Defendant would not receive the coverage he deserves under the contract. Counsel thus appears to have been turning back to Respondents' arguments about Defendant's habeas proceedings with regard to Plaintiff's duty to defend Defendant in the Civil Case, which, as discussed above, the court rejects.

court from issuing declaratory judgment under Maryland law and the other legal issues in the coverage suit were "close" and "problematic."  955 F.2d at 236, 240.  The same concerns are not present here, however, where Maryland law governs the contract, but the Civil Case is taking place in Virginia, which clearly has little interest in resolving questions of Maryland law.[12]  As noted above, the Virginia Circuit Court stayed its proceedings in the Civil Case specifically to allow this court to make a determination on the insurance issue, so both comity and efficiency support resolution of the coverage issue here. Making a determination on coverage before the trial in the Civil Case will both "serve a useful purpose in clarifying and settling the legal relations in issue," and "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Nautilus*, 15 F.3d at 375 (quoting *Quarles*, 92 F.2d at 325).  Because Plaintiff's duties to defend and indemnify Defendant in the Civil Case represent

---

[12] Moreover, unlike in *Mitcheson*, the *Brohawn* rule would not preclude declaratory judgment here because the "ultimate issue[s] upon which coverage" is being determined in this case are different than the issues in the tort litigation.  The *Brohawn* insurer was challenging coverage based on the insured's intent, which the court in the tort suit would necessarily have to resolve.  In the instant motion, the ultimate issues are whether Defendant committed a criminal act or failed to cooperate with Plaintiff's investigation as required by the Policies.  The Virginia court in the Civil Case is unlikely to resolve either of these inquiries.  Therefore, even if it were applicable, *Brohawn* would not dictate that this court should wait until the completion of the Civil Case.

the only controversy between those two parties, adjudication of the case through declaratory judgment would resolve their entire dispute.   This dispute is also sufficiently distinct from the Civil Case so that "overlapping issues of fact or law" would not cause any entanglement between the federal and state courts. Indeed, granting summary judgment based on Defendant's criminal act here does not "put at risk, by issue preclusion or claim preclusion, the ability of any state court to adjudicate fairly the underlying liability."   *Icarom*, 904 F.Supp. at 460.   This also does not appear to be a "procedural fencing" case in which "a party has raced to federal court in an effort to get certain issues that are already pending before the state courts resolved first in a more favorable forum."   *Nautilus*, 15 F.3d at 380. Thus, it is appropriate to issue a declaratory judgment.

## VI.  Conclusion

For the foregoing reasons, the motion for summary judgment filed by Plaintiff Chartis Property Casualty Company will be granted.  A separate order will follow.

                                    /s/
                         _____
                         DEBORAH K. CHASANOW
                         United States District Judge